In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2576

Cincinnati Insurance Company,

Plaintiff-Appellant,

v.

Eastern Atlantic Insurance Company and
Integrity Underwriters, Inc.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 6763--James F. Holderman, Judge.

Argued May 10, 2001--Decided August 2, 2001


   Before Posner, Easterbrook, and Diane P.
Wood, Circuit Judges.

   Posner, Circuit Judge.  The plaintiff in
this diversity suit (governed, all agree,
by Illinois law) is an insurance company
that we'll call "Cincinnati." The
complaint seeks a declaration that
Cincinnati has no duty to defend the two
defendants, "Eastern" and "Integrity,"
under the basic liability policy that it
had issued to them and under an umbrella
liability policy that it had issued to
Integrity alone. Eastern is another
insurance company, while Integrity is an
insurance agency that produces business
for Eastern. The district court granted
judgment on the pleadings for the
defendants, holding that Cincinnati has a
duty to defend under both policies.

   The litigation against Eastern and
Integrity that Cincinnati refuses to
defend began when Eastern sued another
insurance agency that produced business
for it, "Midwest," for breach of contract
and related wrongs. Midwest
counterclaimed and added a third-party
claim against Integrity, which we'll
pretend, for simplicity's sake, is part
of the counterclaim. It is against the
counterclaim that Eastern and Integrity
asked Cincinnati to defend.

So far as bears on this appeal, the counterclaim charges Eastern with tortiously interfering with an agreement between Midwest and still another insurance agency, "Shewmake," which had assisted Midwest in obtaining insurance customers for Eastern. A means of interference that the counterclaim specifically alleges is a letter that Eastern wrote to Midwest demanding that it fire the Shewmake agency. The letter unfortunately is not a part of the record, but according to the counterclaim it expressed "concern over Mr. Shewmake's character" and was "intentionally and maliciously sent for the purpose of inducing [Midwest] to terminate [its] relationship with" him. Why would Eastern care about Midwest's relationship with Shewmake? Apparently because Midwest produced insurance business not only for Eastern but, presumably with the aid of Shewmake, for Eastern's competitors as well; and indeed the counterclaim also charges Eastern and Integrity with tortious interference with "valid business relationships" that Midwest had developed with other insurance companies, besides Eastern, for which Midwest procured business. The theory of the counterclaim appears to be that Eastern wanted the Eastern customers that Midwest had obtained to switch to Integrity and the other insurance companies for which Midwest worked to drop Midwest, as "by causing notification to falsely be given to [those other] insurance carriers that [Midwest was] engaged in activities which could trigger liability under their Errors and Omissions policies." If Midwest went out of business and Integrity procured business only for Eastern, Eastern would pick up business that Midwest had formerly given other insurance companies.

In short, the counterclaim charged interference with contractual and other business relations, achieved by various nefarious means; hence tortious interference by Eastern and its tool, the misnamed Integrity. The insurance policies on the basis of which Eastern and Integrity seek defense and indemnity, however, do not mention tortious interference. As far as this case is concerned, the basic policy (commercial general liability--"CGL" in the trade) covers "oral or written publication of material that slanders or libels a person

or organization or disparages a person's or organization's goods, products or services," while the umbrella policy covers "libel, slander or defamation of character." The basic policy excludes, however, injury "arising out of oral or written publication of material if done by or at the direction of the insured with knowledge of its falsity," while the umbrella policy requires in addition to injury an "occurrence" defined as something that "unexpectedly or unintentionally results in personal injury," and by this means excludes intentional or expected injury. The discrepancy between the basic and umbrella coverage may seem disquieting, since most individuals buy an umbrella policy believing that it provides uniformly larger limits; this umbrella has holes in it. But the purchasers here are not individuals; they are companies that may want greater coverage for some risks but not all. Anyway, no issue is made of the existence of the discrepancy, as distinct from the difference it may make in the defendants' rights under the two policies.

The allegations of Midwest's counterclaim suggest that, like Shewmake (who has not, however, so far as we know at any rate, sued Eastern or Integrity), Midwest was defamed by the "false notification" of its insurer clients that it was engaged in activities that would trigger claims against them; by the same token, the allegations suggest disparagement of Midwest's services. (The tort of commercial disparagement is codified in Illinois in 815 ILCS 510/2(8)--despite which one court has questioned whether the tort exists in that state. Becker v. Zellner, 684 N.E.2d 1378, 1387-88 (Ill. App. 1997). Eastern's suit, like the present suit, is governed by Illinois law.) Defamation and disparagement are explicitly covered by the basic policy, and defamation by the umbrella policy. But neither tort is named in the counterclaim. No matter. Coverage does not depend on the characterization of the wrong by the plaintiff (in this case counterplaintiff, Midwest). Modern pleading requires the pleading only of a claim, not of a legal theory; and so if a specific tort or other legal wrong named in the insurance policy has to be named in the suit for liability coverage to exist, insurance

protection could be lost as the result of a totally inconsequential omission by the drafter of the complaint. Such a rule would also be an invitation to strategic pleading.

The rule therefore is instead that the insured is covered against particular conduct alleged against it regardless of the label placed on that conduct by the pleader. As the Supreme Court of Illinois said in Outboard Marine Corp. v. Liberty Mutual Ins. Co., 607 N.E.2d 1204, 1212 (Ill. 1992), "Refusal to defend is unjustifiable unless it is clear from the face of the underlying complaint that the facts alleged do not fall potentially within the policy's coverage" (emphasis added). "The complaint need not allege or use language affirmatively bringing the claims within the scope of the policy, as the question of coverage should not hinge exclusively on the draftsmanship skills or whims of the plaintiff in the underlying action." Western Casualty & Surety Co. v. Adams County, 534 N.E.2d 1066, 1068 (Ill. App. 1989). (For a case so holding that is factually similar to ours, see Tews Funeral Home, Inc. v. Ohio Casualty Ins. Co., 832 F.2d 1037, 1044 (7th Cir. 1987) (per curiam), applying Illinois law.) As we said in reference to another state's law (materially identical, however, to Illinois law in this regard), "The insurer's obligations are not circumscribed by the plaintiff's choice of legal theories. The plaintiff's complaint, upon which the insurer's duty depends, need not even set forth the plaintiff's legal theories. What is important is not the legal label that the plaintiff attaches to the defendant's (that is, the insured's) conduct, but whether that conduct as alleged in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers. So, for example, if the complaint alleges facts that if proved would show that the insured had infringed the plaintiff's copyright, the policy kicks in even if the complaint charges the insured only with fraud or intentional infliction of emotional distress." Curtis-Universal, Inc. v. Sheboygan Emergency Medical Services, Inc., 43 F.3d 1119, 1122 (7th Cir. 1994) (citations omitted).

Both insurance policies, however, exclude intentional misconduct, though

very differently defined; and we must consider whether the allegations of Midwest's counterclaim bring Eastern's or Integrity's claims against Cincinnati within the exclusions. The umbrella policy limits coverage to an "occurrence," which the policy defines as something that "unexpectedly or unintentionally results in personal injury," thus excluding conduct intended to injure. The basic policy excludes injury "arising out of oral or written publication of material if done by or at the direction of the insured with knowledge of its falsity." The counterclaim is replete with allegations of deliberate misconduct by Eastern and Integrity, but these allegations do not take the case out of the basic policy. They are much more likely to have been intended as a pitch for punitive damages than as a limitation of the claim--a limitation because merely negligent defamation is actionable in Illinois when the victim is not a public figure. Troman v. Wood, 340 N.E.2d 292, 299 (Ill. 1975). Such a limitation would be foolish; why would Midwest commit itself to abandon its claim for defamation merely because of inability to prove facts inessential to such a claim, though helpful in jacking up damages? Proof of deliberateness would merely be the icing on the cake. It is also possible that Midwest is describing as deliberate misconduct a case in which deliberate disparagements are made even if the disparager is merely negligent with regard to their truth. Unless he knows that his disparagements are false, he is not within the basic policy's exclusion.

So Cincinnati had a duty to defend both Eastern and Integrity under the basic policy. The umbrella policy's exclusion of conduct intended (or expected) to injure is broader than the basic policy's, raising the spectre of illusory coverage by excluding all intentional torts except "unintentional" intentional torts. Hurst-Rosche Engineers, Inc. v. Commercial Union Ins. Co., 51 F.3d 1336, 1345-46 (7th Cir. 1995); Tews Funeral Home, Inc. v. Ohio Casualty Ins. Co., supra, 832 F.2d at 1045; North Bank v. Cincinnati Ins. Cos., 125 F.3d 983, 986-87 (6th Cir. 1997). (Notice the paradox: the broader the exclusion, the more likely it is to fail, if by making the coverage illusory it suggests a deep

ambiguity in the insurance policy.) Some of the torts expressly covered by the umbrella policy are intentional torts, such as false arrest, battery, and malicious prosecution, and the cases just cited hold that the policy should not be interpreted as taking back with one hand what it gave with another, by excluding coverage of those torts because they are intentional.

But it is important to this case that the exclusion is not of intentional torts as such (nor is defamation an intentional tort in any simple sense), but of tortious conduct in which there is an intent to injure or an expectation of injuring. And in the case of defamation, at least, the exclusion does not track the tort. Apart from the exotic case in which defaming a fictitious person has the unintended and unexpected consequence of defaming a real person with the same name as the fictitious character, resulting in liability if the defendant should have known better, or the slightly more common case, treated similarly, of mistaken identification, e.g., Ryder v. Time, Inc., 557 F.2d 824, 825-26 (D.C. Cir. 1976), defamation is often not intended or expected to injure anyone. The defamer may have made a good-faith though inadequate attempt to conceal the victim's name, may have thought the victim's reputation already impaired beyond possibility of further damage, or, the most common case, may have thought the defamatory statement true, in which event there would be no injury in a legal sense. So intent to injure or expectation of injuring is not an element of the tort of defamation, as it is of tortious interference with contract or with advantageous business relations (which is not a tort covered by the insurance policy, though we have seen that there is still a duty to defend if the facts constituting a covered tort, such as defamation, are alleged). Because the exclusion, therefore, though broad, is not so broad as to make the coverage illusory, it must be enforced according to its terms. Fuisz v. Selective Ins. Co., 61 F.3d 238, 243-45 (4th Cir. 1995).

Still, Integrity may have acted maliciously yet not have intended a legal harm. It might, for example, have made disparaging statements about Midwest that it hoped would do Midwest in but believed

to be true. Id. But Integrity has failed in its brief in this court to respond to Cincinnati's contention that the umbrella policy's exclusion bars its claim. Now an appellee's failure to respond to an argument by the appellant is not in itself a forfeiture requiring that we reverse the judgment appealed from. The argument may be nondispositive or frivolous. The entire appeal, indeed, may be frivolous, in which event even the appellee's failure to file a brief will not warrant reversal. See 7th Cir. R. 31(d); In re Rios, 901 F.2d 71 (7th Cir. 1990) (per curiam). But Cincinnati's argument concerning the scope of the umbrella policy's exclusion is not frivolous or nondispositive, and from Integrity's failure to mention it we infer that Integrity acquiesces, rightly or wrongly (our analysis in the preceding paragraph suggests wrongly), in Cincinnati's interpretation of the policy as excluding even the "innocent" defamations that we have listed, as in West American Ins. Co. v. Vago, 553 N.E.2d 1181, 1185 (Ill. App. 1990), a battery case. That acquiescence operates as a waiver, and we conclude that Cincinnati has no duty to defend Integrity under the umbrella policy.

We close with a procedural matter. The jurisdictional statements in the parties' opening briefs were incorrect. The appellant, Cincinnati, alleged that Eastern was a "Pennsylvania corporation that does business in the state of Illinois" and Integrity "a Florida corporation that does business in the state of Illinois." There is no reference to the principal place of business of either defendant, even though for purposes of the diversity jurisdiction of the federal courts a corporation is a citizen of the state of its principal place of business as well as of the state in which it is incorporated. 28 U.S.C. sec. 1332(c)(1). Cincinnati's counsel seems to have been laboring under the profound misconception that a defendant must do business in the state in which the case is brought in order to be within the district court's jurisdiction. The appellees' brief, either through sharing this misconception or through sheer carelessness, incorrectly states that the appellant's jurisdictional statement is complete and correct; it is incomplete. Both jurisdictional statements therefore

violate the rules of this court. See 7th Cir. R. 28(a)(1), (b).

We directed the parties to file supplemental statements of jurisdiction. They filed a joint statement that while at last complete and correct, and showing that the case is indeed within the diversity jurisdiction, lamely states that the reason for the erroneous allegations of jurisdiction in the original briefs was that the complaint had alleged jurisdiction so. That is a feeble excuse. Error does not excuse its repetition. We have warned litigants about the precise pattern observed here-- a patently erroneous jurisdictional statement by the appellant, and a patently erroneous statement by the appellee that the appellant's jurisdictional statement is complete and correct. Professional Service Network, Inc. v. American Alliance Holding Co., 238 F.3d 897, 902-03 (7th Cir. 2001). We quote the rule to make clear that there is no ambiguity that could excuse counsel's performance: "If any party is a corporation, the statement [of jurisdiction] shall identify both the state of incorporation and the state in which the corporation has its principal place of business." 7th Cir. R. 28(a)(1). The parties' counsel, having been given an opportunity to explain their violation of the rule, are hereby reprimanded. The district court's judgment is affirmed insofar as it rejects Cincinnati's claim that it has no duty to defend Eastern and Integrity under the basic policy, but it is reversed insofar as it rejects Cincinnati's claim to have no duty to defend Integrity under the umbrella policy, and the case is remanded for entry of judgment in Cincinnati's favor on the second claim.