In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 06-3938, 06-3962, 06-3978, 06-4156, 06-4244 & 06-4257

BASF AG,

*Plaintiff-Appellee,*

*v.*


GREAT AMERICAN ASSURANCE CO.,
FEDERAL INSURANCE CO., and
WESTCHESTER FIRE INSURANCE CO.,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6969—**Samuel Der-Yeghiayan**, *Judge.*

_____

ARGUED NOVEMBER 30, 2007—DECIDED APRIL 14, 2008

_____


Before BAUER, KANNE, and EVANS, *Circuit Judges.*[Œ]

_____

[Œ] Following oral argument, Circuit Judge Kenneth F. Ripple disqualified himself as a member of the panel and had no role in the preparation of this decision. Circuit Judge Terence T. Evans was appointed as the third member of the panel, and was furnished with a transcript and audio recording of oral argument, as well as the briefs and the record on appeal.

KANNE, *Circuit Judge*. This insurance-coverage action represents the third case in a series of lawsuits stemming from the marketing of Synthroid, a synthetic thyroid drug. *See In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001); *Knoll Pharm. Co. v. Auto. Ins. Co.*, 152 F. Supp. 2d 1026 (N.D. Ill. 2001). The first case—a multi-district litigation—consolidated numerous class actions filed by consumers and health insurers that sought damages for the alleged monopolization, racketeering, fraud, and deceptive business practices of Synthroid's producers. *See Synthroid*, 264 F.3d at 714. After the multi-district litigation settled, the *Synthroid* defendants filed the second case; that insurance-coverage suit sought damages from the *Synthroid* defendants' primary-insurance providers for the insurers' alleged failure to defend them in, and indemnify them for, the settlement of the multi-district litigation. *See Knoll Pharm. Co.*, 152 F. Supp. 2d at 1031. While it was pending on appeal, the second case also settled.

German corporation BASF AG ("BASF") then filed this third suit, seeking to recover damages from its umbrella insurers for their failure to defend and indemnify BASF, and its related corporate entities, in the initial *Synthroid* litigation. The district court in this case decided that the umbrella-insurance policies required the insurers to defend BASF in the *Synthroid* litigation, and granted summary judgment to BASF on the insurers' liability for breach of contract. We disagree. The terms of the umbrella policies, as a matter of law, did not obligate the insurers to defend or indemnify BASF. We therefore reverse, and remand to the district court for the entry of summary judgment in favor of the insurers.

## I. HISTORY

Between 1989 and 1995, BASF's predecessor in interest, Boots Pharmaceuticals, Inc. ("Boots"), purchased two layers of liability insurance: primary insurance and umbrella insurance.[1] The primary-insurance policies all contained similar provisions, which stated that the insurers would indemnify Boots for lawsuits seeking damages "arising out of" claims for a "personal injury" or an "advertising injury." The primary policies uniformly defined an "advertising injury" as, among other things, an "injury arising out of . . . oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services." Moreover, the primary policies each outlined the insurer's duty to defend: each primary policy required the insurer to pay all costs that Boots incurred in defense of any suit for which the insurer would be obligated to indemnify Boots.

The umbrella-insurance policies provided two additional types of insurance coverage to Boots: excess coverage and gap-filling coverage. All of the umbrella policies contained excess-insurance provisions, which required the

---

[1] In March 1995, BASF acquired Boots and its related entities and completely merged the companies into a new BASF subsidiary, Knoll Pharmaceutical Company ("Knoll"). Incident to this transaction, Knoll and BASF assumed the benefits of the liability-insurance policies previously obtained and held by Boots. BASF sold Knoll to Abbott Laboratories ("Abbott") in March 2001. However, pursuant to the Purchase Agreement, BASF retained its right to recover any damages from Boots's insurers for the *Synthroid* litigation. For clarity, we will refer to BASF and Knoll collectively as BASF throughout this opinion.

umbrella insurers to indemnify Boots for sums Boots became liable for that exceeded the coverage limits of its primary-insurance policies. Some of the umbrella policies also included gap-filling-insurance provisions, which obligated the umbrella insurers to defend Boots for any loss covered by the terms and conditions of the umbrella policy, and "not covered as warranted" by the primary insurers. Other umbrella policies described this gap-filling coverage as the obligation to defend any suit or any claim potentially covered by the umbrella policies to which the primary policies did not apply.

The defendants in this action—Great American Assurance Company ("Great American"), Federal Insurance Company ("Federal"), and Westchester Fire Insurance Company ("Westchester")—hold six of these umbrella-insurance policies.[2] Like the primary-insurance policies, the umbrella policies covered only lawsuits that sought damages "arising out of" or "because of" a "personal injury" or an "advertising injury." The umbrella policies all defined personal injury and advertising injury in a manner that was substantively identical to the primary policies' definitions of those terms. Put another way, exclusions aside, the primary policies' and umbrella policies' coverage of personal injury and advertising injury was coextensive, and a suit or claim that did not

_____

[2] Great American changed its name from Agricultural Insurance Company ("Agricultural") sometime after Agricultural originally issued one umbrella policy to Boots. Westchester holds three of the six umbrella policies, which were initially provided to Boots by International Insurance Company and subsequently novated to Westchester. Federal issued, and continues to hold, the other two umbrella policies.

arise out of, or because of, a personal injury or an advertising injury would not be covered under either the primary or the umbrella policies.

In 1987, Boots began to manufacture, market, and sell Synthroid, a synthetic thyroid medication used to treat various thyroid diseases. In an attempt to prove that Synthroid was superior to competing synthetic thyroid hormones on the market, in the late 1980s Boots commissioned a study by Dr. Betty Dong of the University of California-San Francisco ("UCSF"). Boots hoped the study would prove that Synthroid and its competitors (among them, cheaper generic hormones) were not "bioequivalents"—drugs that have the same effect on a patient in terms of potency and absorption rate when equal doses are administered. *See Synthroid*, 264 F.3d at 714. However, in 1990, Dr. Dong discovered that Synthroid and its competitors were, in fact, bioequivalents, and that all of the compared synthetic hormones, including the cheaper generics, were as effective as Synthroid at treating thyroid diseases.

When provided with these results, Boots immediately sought to discredit Dr. Dong and her findings. Boots's scientists sent letters to Dr. Dong that questioned her methods and conclusions, and Boots asked UCSF to terminate the study. UCSF did not comply and in 1994, Dr. Dong provided her final report to Boots, which stated that Synthroid and its competitors were bioequivalents. Even after Boots learned of Dr. Dong's results, Boots continued to publicly maintain that Synthroid had no known bioequivalents, and Boots continued to advertise and market the drug as such. In early 1995, Boots exercised its rights under its contract with Dr. Dong to block the publication of her study.

In 1996, the *Wall Street Journal* learned of Dr. Dong's study and Boots's response, and it published an exposé on Boots and Synthroid. The article revealed to the public that there were cheaper alternatives to Synthroid, and that Boots had prevented the publication of Dr. Dong's study, which had confirmed that the cheaper alternatives were equally effective. Dr. Dong's study was eventually published in 1997. *See Synthroid*, 264 F.3d at 714. On the heels of the *Wall Street Journal* article and the publication of Dr. Dong's study, over 70 lawsuits (mostly class actions) were filed against BASF and its employees. These suits, filed by consumers and health insurers, alleged a potpourri of antitrust, racketeering, fraud, misrepresentation, deceptive-business-practices, and unjust-enrichment claims all based on the fact that Boots had deceived consumers into purchasing Synthroid, which occupied 70% of the $600 million market for thyroid drugs at the time. In 1997, the lawsuits were consolidated into a multi-district litigation in the Northern District of Illinois, under 28 U.S.C. § 1407. *See In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999) (certifying Synthroid consumer class); 188 F.R.D. 287 (N.D. Ill. 1999) (certifying Synthroid third-party payor class).

The gravamen of the consolidated complaints was that Boots, BASF, and their employees had wrongfully asserted monopoly control over the market for thyroid medication, which resulted in consumers and health insurers paying higher prices for Synthroid rather than purchasing lower-cost, equally effective alternatives. Both complaints claimed that the defendants had exercised monopoly control by suppressing Dr. Dong's study and criticizing her methodology and results, by concealing known facts about Synthroid, and by marketing Synthroid as a uniquely

superior drug despite knowledge to the contrary. Both complaints sought economic damages for the class members (consumers and health insurers) who overpaid for Synthroid. Neither complaint sought damages on behalf of Dr. Dong or on behalf of the competing thyroid manufacturers, and neither complaint alleged defamation, libel, disparagement, or slander.

In April 1997, BASF tendered the *Synthroid* complaints to its primary insurers. The primary insurers each separately refused to defend BASF, claiming that they had no obligation to do so under the primary-insurance policies' definitions of personal injury and advertising injury. In late June 1997, BASF notified its umbrella insurers about the *Synthroid* litigation, shortly before beginning formal settlement negotiations with the class-action plaintiffs. On August 1, 1997, before any of the umbrella insurers had responded with coverage determinations, BASF entered into a settlement agreement with the *Synthroid* plaintiffs. In 2000, the *Synthroid* court approved a settlement that required BASF to pay approximately $88 million to the consumers and $46 million to the third-party payors in exchange for a release of all claims. *See In re Synthroid Mktg. Litig.*, 110 F. Supp. 2d 676, 679-86 (N.D. Ill. 2000), *aff'd in part, rev'd in part*, 264 F.3d 712. BASF spent approximately $39.4 million in defending and negotiating a settlement to the *Synthroid* litigation. *See In re Synthroid Mktg. Litig.*, 325 F.3d 974, 976-80 (7th Cir. 2003) (adjusting attorneys' fee award after remand).

After settling with the class-action plaintiffs, BASF filed an insurance-coverage suit against its primary insurers seeking to recover damages for the insurers' failure to defend and indemnify BASF in the *Synthroid* litigation. *See Knoll Pharm. Co.*, 152 F. Supp. 2d at 1031. The district court

in *Knoll* agreed that the primary insurers should have defended BASF because the consolidated complaints had alleged an advertising injury. *Id*. at 1038-39. Consequently, the *Knoll* court ordered the primary insurers to indemnify BASF up to their respective policy limits (a total of $12 million) and to pay the $39.4 million in defense costs that BASF incurred from the *Synthroid* litigation; the court also added prejudgment interest to both awards. *Knoll Pharm. Co. v. Auto. Ins. Co.,* 210 F. Supp. 2d 1017, 1025-28 (N.D. Ill. 2002). The primary insurers appealed the *Knoll* decision, which was briefed and argued before our court, but the parties settled before we could reach a disposition, for $18 million—just over one-third of the *Knoll* court's total judgment.

After settling the *Knoll* case with its primary insurers, BASF filed this diversity lawsuit, *see* 28 U.S.C. § 1332, against the umbrella insurers. The complaint alleged that the umbrella insurers owed BASF over $110 million for BASF's unrecovered costs from the *Synthroid* litigation. The complaint sought $90 million for BASF's settlement costs and $21.4 million in defense costs—BASF arrived at these amounts by deducting the sums it received in its settlement of *Knoll* with the primary insurers from its total expenditure on the settlement and defense of *Synthroid*.

The parties completed discovery and then filed cross-motions for summary judgment. The district court evaluated the voluminous summary judgment record and held that Federal, Westchester, and Great American had breached their respective contractual duties to defend BASF during the *Synthroid* litigation. The district court relied heavily on the *Knoll* decision, and adopted its reasoning that the *Synthroid* class plaintiffs' claims "may

have had their origin in slander, libel, or disparagement," which fell under the umbrella policies' definitions of advertising injury. The district court explained that while the *Synthroid* complaints did not allege libel, slander, or disparagement, the *Synthroid* litigation "grew out of various disparaging, defamatory, and libelous statements," such as Boots's claims that Synthroid was superior to other thyroid drugs and Boots's criticism of Dr. Dong's study.

After granting summary judgment to BASF on its breach-of-contract claims, the district court held that the breach estopped the umbrella insurers from contesting coverage; the court then allowed the case to proceed to trial on the amount of damages. After a two-day trial, a jury set damages at $90 million for BASF's unrecovered costs of the *Synthroid* settlement; it allocated $50 million of the damages to Federal, $30 million to Westchester, and $10 million to Great American. The jury also held the umbrella insurers jointly and severally liable for the remaining $21.4 million of defense costs. The district court then added over $45 million in prejudgment interest to the amounts awarded by the jury. The umbrella insurers timely filed this appeal.

## II. ANALYSIS

On appeal, Great American, Federal, and Westchester claim that the district court erred when it granted summary judgment to BASF on its breach-of-contract claims. Specifically, the umbrella insurers argue that the class-action complaints in the consolidated *Synthroid* litigation advanced claims that did not fall under the umbrella-insurance policies' definitions of personal injury or adver-

tising injury. The umbrella insurers maintain that, as a result, their duties to defend and indemnify BASF were never triggered by the *Synthroid* litigation, and that the district court should have entered summary judgment in their favor. The umbrella insurers raise numerous additional challenges to the district court's decisions to limit discovery, exclude certain evidence at the damages trial, assess prejudgment interest, and deny the insurers' post-trial motions.

We review the district court's decision on cross-motions for summary judgment *de novo*. *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526 (7th Cir. 2005). "With cross-motions, we construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made*." Id*. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The parties all concede that the substantive law of Illinois governs this diversity action. Under Illinois law, the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1077 (Ill. 1993); *see also Conn. Indem. Co. v. DER Travel Serv., Inc.*, 328 F.3d 347, 349 (7th Cir. 2003). We review the district court's construction of an insurance policy *de novo*. *See Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E. 2d 307, 313 (Ill. 2006).

"A court's primary objective in construing the language of an insurance policy is to ascertain and give effect to the

intentions of the parties as expressed by the language of the policy." *Id.* at 314; *see also Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). "In performing that task, the court must construe the policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 286 (Ill. 2006). Where the terms of an insurance policy are clear and unambiguous, they must be applied as written; but where ambiguity exists, the terms will be strictly construed against the drafter. *Id.* at 286; *Valley Forge Ins. Co.*, 860 N.E.2d at 314. Policy terms "are ambiguous if they are reasonably susceptible to more than one interpretation, not simply if the parties can suggest creative possibilities for their meaning, and a court will not search for ambiguity where there is none." *Valley Forge Ins. Co.*, 860 N.E.2d at 314 (internal citations omitted).

"An insurer's duty to defend is much broader than its duty to indemnify its insured." *Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005); *see also Crum & Forster*, 620 N.E.2d at 1079. In order to determine whether the umbrella insurers had a duty to defend BASF under Illinois law, we must compare the facts alleged in the consolidated *Synthroid* complaints to the relevant provisions of the umbrella-insurance policies. *See Valley Forge Ins. Co.*, 860 N.E.2d at 314. In making this comparison, we construe the allegations liberally in favor of the insured. *Id.*; *Employers Ins. of Wausau v. Ehlco Liquidating Trust,* 708 N.E.2d 1122, 1136 (Ill. 1999). If the facts alleged in the *Synthroid* complaints fell within, or potentially within, the umbrella policies' coverage, then the umbrella insurers were obligated to

defend BASF. *See Valley Forge Ins. Co.*, 860 N.E.2d at 314-15; *Gen. Agents Ins.,* 828 N.E.2d at 1098. This is true even if the *Synthroid* complaints contained groundless, false, or fraudulent allegations, and even if only one of several theories of recovery fell within the potential coverage of the umbrella policies. *See Valley Forge Ins. Co.*, 860 N.E.2d at 315; *Gen. Agents Ins. Co.,* 828 N.E.2d at 1098. The umbrella insurers' refusal to defend BASF was only justified if it was clear from the face of the *Synthroid* complaints that the allegations failed to state facts that brought the case within, or potentially within, the coverage of the umbrella policies. *See Valley Forge Ins. Co.*, 860 N.E.2d at 315; *Gen. Agents Ins. Co.,* 828 N.E.2d at 1098.

The parties all agree that the only policy definitions that BASF's claims could fall (or potentially fall) within are the umbrella-insurance policies' coverage of "injury arising out of" the "offenses" of "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services." The parties also all concede that the *Synthroid* class plaintiffs did not plead slander, libel, or disparagement as causes of action in the consolidated complaints. If Illinois law required that the plaintiff specifically plead a covered cause of action to trigger an insurer's duty to defend, we could end our analysis here. However, it does not. *See, e.g.*, *Cincinnati Ins. v. E. Atl. Ins. Co.*, 260 F.3d 742, 745 (7th Cir. 2001) ("[T]he insured is covered against particular conduct alleged against it regardless of the label placed on that conduct by the pleader."); *W. Cas. & Surety Co. v. Adams County*, 534 N.E.2d 1066, 1068 (Ill. App. Ct. 1989) ("[T]he question of coverage should not hinge exclusively on the draftsmanship skills or whims of the plaintiff in the underlying action."). Therefore, we

must determine whether the factual allegations of the complaint could tacitly "sketch a claim that is within the scope of the policy." *W. States Ins. Co. v. Wis. Wholesale Tire, Inc.*, 184 F.3d 699, 702 (7th Cir. 1999); *see also Valley Forge Ins. Co.*, 860 N.E.2d at 315. So, in this case, we must ask whether the *Synthroid* complaints sketched a claim for the offenses of slander, libel, or disparagement, which are covered by the umbrella policies.

We believe that the facts in the *Synthroid* complaints are simply insufficient to sketch a claim for the common-law offenses of libel, slander, or disparagement, which in Illinois all require that a false statement be made *about the plaintiff. See Solaia Tech., LLC v. Specialty Pub. Co.,* 852 N.E.2d 825, 839 (Ill. 2006) ("To state a defamation claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff . . . ."); *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 853 N.E.2d 770, 782 (Ill. App. Ct. 2006) ("[A]n action for commercial disparagement lies when the quality of [a business's] goods is demeaned."), *rev'd on other grounds*, 227 Ill.2d 381 (Ill. Feb. 7, 2008); *Thomas v. Fuerst*, 803 N.E.2d 619, 623 (Ill. App. Ct. 2004) ("To establish either slander or libel, plaintiff must show that: (1) defendant made a false statement concerning plaintiff . . . . "); *see also Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 698 (7th Cir. 2006). Neither the consumer class-action complaint nor the third-party payor complaint claimed that Boots or its related entities made defamatory, libelous, slanderous, or disparaging statements about the class members or their products. And the *Synthroid* complaints' omission of a claim for common-law libel, slander, or disparagement makes sense because the only allegedly actionable statements did not "disparage" thyroid patients or health-insurance providers—

they targeted Dr. Dong's study as unreliable, and other thyroid drugs as unsuitable bioequivalents of Synthroid.

In addition to the requirements of the Illinois common law, the *Synthroid* class plaintiffs would have faced a further obstacle to sketching a claim for libel, slander, or disparagement based on the statements about Dr. Dong and Synthroid's competitors—the class plaintiffs would not have had standing to do so. *See Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 11 (2004) ("In every federal case, the party bringing the suit must establish standing to prosecute the action."). Part of the Article III standing inquiry is whether the plaintiff has asserted an injury-in-fact that is particularized to *him. See, e.g., id.* at 12; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is . . . concrete and particularized . . . ."); *Warth v. Seldin,* 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury *to the complaining party* . . . ." (emphasis added)). But the parties injured by the allegedly disparaging statements—Dr. Dong, her research affiliates, and the producers of competing thyroid drugs—were not part of the *Synthroid* plaintiff classes.

Despite the *Synthroid* complaints' failure to sketch a common-law claim for libel, slander, or disparagement, BASF argues that the umbrella insurers still had a duty to defend it in the *Synthroid* litigation because the consumer plaintiff class implicitly advanced a disparagement claim by pleading that Boots violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), 815 ILCS 505/1, *et seq.* To advance this contention, BASF relies on the Illinois Supreme Court's recent

decision, *Valley Forge Insurance Co. v. Swiderski Electronics Inc.*, which interpreted an insurance policy that defined an advertising injury as: "Oral, written, televised or videotaped publication of material that violates a person's right of privacy." *See* 860 N.E.2d at 315. The underlying complaint in *Valley Forge* did not assert a common-law tort for violation of privacy; it only asserted a claim under the federal Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 (2000). *See Valley Forge Ins.*, 860 N.E.2d at 315. Notwithstanding the plaintiffs' failure to assert a common-law privacy tort in the complaint, the Illinois Supreme Court required the insurer to defend the TCPA suit under the policy's definition of advertising injury because the statutory claim under the TCPA vindicated the same injuries as a common law action for violation of privacy: "[t]he receipt of an unsolicited fax advertisement implicates a person's right of privacy insofar as it violates a person's seclusion, and such a violation is one of the injuries that a TCPA fax-ad claim is intended to vindicate." *Id.* The Illinois Supreme Court stated that though the complaint made "no mention of the right of privacy," it was "unproblematic, as a violation of privacy in the sense of a violation of seclusion is implicit in a TCPA fax-ad claim." *Id*. at 316.

BASF argues that similarly, coverage is warranted under the umbrella-insurance policies at issue here because a claim for disparagement is implicit in the *Synthroid* plaintiffs' statutory claim under the CFA. But we do not believe that this case is analogous to *Valley Forge*. The CFA seeks to vindicate the rights of consumers by creating a cause of action that protects consumers from deceptive trade practices, fraud, and other abusive acts by businesses that market products to the public. *See, e.g., Pappas v. Pella Corp.*,

844 N.E.2d 995, 1000 (Ill. App. Ct. 2006) (" 'The Act was intended to protect consumers against fraud, unfair methods of competition, and unfair or deceptive acts or practices in the conduct of trade or commerce.' " (quoting *Elson v. State Farm Fire & Cas. Co.*, 691 N.E.2d 807, 816 (Ill. App. Ct. 1998))). In other words, the CFA allows consumers to recover damages for the economic injuries they suffer. It does not directly advance the interest another business has in preserving the reputation of its products that a disparagement action protects. Thus, the CFA does not expand a common-law disparagement plaintiff's avenues for legal relief in the manner that the TCPA bolsters the right to privacy. Instead, the CFA fortifies the economic interests of consumers, who would not have standing to pursue relief for the libel, slander, or disparagement injury of a third party.

Nevertheless, BASF urges us to adopt the expansive position of the district court—that the *Synthroid* complaints did not need to assert every element of an offense delineated by the umbrella-insurance policies in order to trigger the umbrella insurers' duty to defend, because the language in the umbrella policies required the umbrella insurers to cover claims that "may have had their origin in" the offenses of libel, slander, or disparagement. However, following this approach would unmoor coverage determinations from the factual allegations of the complaint—something that Illinois law will not permit us to do. *See, e.g., Gen. Agents Ins. Co.*, 828 N.E.2d at 1098; *William J. Templeman Co. v. Liberty Mut. Ins. Co.*, 735 N.E.2d 669, 676 (Ill. App. Ct. 2000) ("[I]t must be demonstrated that the *facts alleged* were sufficient to permit recovery for the potentially covered cause of action in the same proceeding. . . . " (emphasis added)); *see also Del Monte Fresh*

*Produce N.A. Inc. v. Transp. Ins. Co.*, 500 F.3d 640, 644 (7th Cir. 2007) ("In conducting this analysis [under Illinois law], 'it is the actual complaint, not some hypothetical version, that must be considered.' " (quoting *Conn. Indem. Co.*, 328 F.3d at 350-51); *Hurst-Rosche Eng'rs v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995) ("[The court] must focus on the allegedly tortious conduct on which the lawsuit is based.").

Abandoning focus on the complaint would mean that the breadth of insurance coverage "could be extended indefinitely." *See Great Am. Ins. Co. v. Riso, Inc.*, 479 F.3d 158, 162 (1st Cir. 2007). The consumer and third-party payor class complaints pursued only economic damages for the injuries they suffered from the artificially high prices for Synthroid, which stemmed from the monopolization and fraudulent concealment of Boots and others—this is a paradigmatic antitrust injury. *See Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). If we allow BASF to shoehorn these collateral claims into the umbrella policies' coverage of slander, libel, or disparagement, then an insured could easily transform a run-of-the-mill antitrust or securities action into a suit seeking redress of libel, slander, or disparagement. As our sister circuit has noted in a factually similar case: it would not be far-fetched to "[i]magine a securities fraud action in which the false boosting of the seller's stock involved (or implied) disparagement of a competing stock that the buyer was considering." *Riso*, 479 F.3d at 162. Reading an insurance policy's coverage provisions as expansively as BASF desires would be a precarious proposition: it might sweep within the breadth of the policy risks that the insurer did not and would not contract to

cover—risks that were not considered when setting the premiums for the policy. *See Nicor, Inc.*, 860 N.E.2d at 286. This, in turn, would make insurance contracts less predictable and more costly for insurers, who would rationally pass the additional cost onto their insureds, making insurance more expensive for everyone.

Insurance is a creature of contract, and as such, Illinois law is sensitive to the parties' intentions. *Valley Forge Ins. Co.*, 860 N.E.2d at 314; *Cent. Ill. Light Co.*, 821 N.E.2d at 213; *Crum & Forster*, 620 N.E.2d at 1078. It seems extremely unlikely to us that the parties intended antitrust and racketeering claims to be covered—or even potentially covered—by a policy definition that sounds in libel, slander, and disparagement. *See Riso*, 479 F.3d at 162. BASF's interpretation of the umbrella-insurance policies could not have been reasonably contemplated by the parties when they entered into these insurance contracts. *See Crum & Forster*, 620 N.E.2d at 1079 ("In our judgment, to construe these . . . policies to cover the claims made in [the] complaint, as the insureds urge us to do, would expand the coverage beyond what was contracted for by the parties."). While we recognize that umbrella insurance is designed to act as a safety-valve for deficiencies in primary insurance, that does not mean that umbrella insurance necessarily covers every risk under the sun. *See Cincinnati Ins. Co.*, 260 F.3d at 744-45 ("The discrepancy between the basic and umbrella coverage may seem disquieting, since most individuals buy an umbrella policy believing that it provides uniformly larger limits; this umbrella has holes in it. But the purchasers here are not individuals; they are companies that may want greater coverage for some risks but not all."). And it is true here that certain risks—those not arising from

personal injury or advertising injury—were not insured under either the primary or umbrella policies. Boots bargained for and paid for coverage (and BASF inherited coverage) only for personal and advertising injuries arising out of the offenses of slander, libel, or disparagement; had it desired more expansive coverage, it could have sought it. We therefore decline to adopt the sweeping definition of "arising out of" that the district court employed.

In concluding that the *Synthroid* complaints fell within the coverage of the umbrella-insurance policies, the district court relied almost exclusively on the decision against the primary insurers in *Knoll*. *See* 152 F. Supp. 2d at 1031, 1039. Because it appears that the primary-insurance policies and umbrella policies utilized the same definitions of personal injury and advertising injury, we are not certain that the *Synthroid* complaints alleged claims within the scope of the primary policies either. But the appeal of that case settled before we had the opportunity to adjudicate its merits. Therefore, the district court's reliance on the *Knoll* decision was understandable, if regrettable.

Because we hold that the umbrella insurers had no duty to defend BASF from the *Synthroid* litigation, it necessarily follows that the umbrella insurers also did not have a duty to indemnify BASF for the settlement. *See Cent. Ill. Light Co.*, 821 N.E.2d at 216; *Crum & Forster*, 620 N.E.2d at 1081. The umbrella insurers were entitled to judgment as a matter of law and summary judgment should have been entered for the umbrella insurers on BASF's breach-of-contract claims. We, therefore, need not reach the other issues that the umbrella insurers have raised in this appeal.

### III. CONCLUSION

We REVERSE the judgment of the district court and REMAND this case for the entry of summary judgment in favor of the defendants.