In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1953

CDX LIQUIDATING TRUST,

*Plaintiff-Appellant*,

*v.*

VENROCK ASSOCIATES, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 7236—**Charles R. Norgle, Sr.**, *Judge*.

ARGUED FEBRUARY 16, 2011—DECIDED MARCH 29, 2011

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This suit, brought by a trust that holds the common stock of a bankrupt company formerly known as Cadant, charges several former directors with breaches of their duty of loyalty to the corporation, and charges two venture-capital groups, which we'll abbreviate to "Venrock" and "J.P. Morgan," with aiding and abetting the disloyal directors. Trial was bifurcated. Seven weeks into the trial on liability the

plaintiff rested and the defendants then moved for judgment as a matter of law. The district judge granted the motion with a brief oral statement of reasons, precipitating this appeal.

Cadant had been created in 1998 to develop what are called "cable modem termination systems," which enable high-speed Internet access to home computers. Though based in Illinois, Cadant initially was incorporated in Maryland and later was reincorporated in Delaware. The founders received common stock in the new corporation at the outset. Others purchased common stock later. Venrock and J.P. Morgan received preferred stock in exchange for an investment in the new company that they made at the beginning of 2000. Eric Copeland, a principal of Venrock, became a member of Cadant's five-member board of directors. He is the director principally accused of disloyalty to Cadant.

In April 2000 the board turned down a tentative offer by ADC Telecommunications to buy Cadant's assets for $300 million. It was later that year that the board proposed and the shareholders approved the reincorporation of Cadant in Delaware, effective January 1, 2001. The suit involves decisions by Cadant's board made both when Cadant was incorporated in Maryland and when it was reincorporated in Delaware. Illinois choice of law principles, which govern this case because it was filed in Illinois, makes the law applicable to a suit against a director for breach of fiduciary duty that of the state of incorporation. *Newell Co. v. Petersen*, 758 N.E.2d 903, 923-24 (Ill. App. 2001). This is what is known as the "internal

affairs" doctrine—"a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982); see also *Nagy v. Riblet Products Corp.*, 79 F.3d 572, 576 (7th Cir. 1996); *Restatement (Second) of Conflicts of Laws* § 309 (1971). The earliest challenged decision by Cadant's board—the decision not to respond to ADC's acquisition offer in April 2000—thus is easily dismissed. Maryland law applied at that time and under that law directors have no duty to "accept, recommend, or respond on behalf of the corporation to any proposal by an acquiring person." Md. Code, Corporations and Associations § 2-405.1(d)(1).

In the fall of 2000, Cadant found itself in financial trouble. The defendants attribute this to the deflating—beginning in the spring of 2000 and continuing throughout the year and into the next year—of the dot-com bubble of the late 1990s. We'll return to the question of what caused Cadant's financial distress, but whatever the cause the company needed fresh investment. The board considered a proposal from a group of Chicago investors and a joint proposal from Venrock and J.P. Morgan, and eventually decided on an $11 million loan from Venrock and J.P. Morgan. The terms of the loan were negotiated on Cadant's behalf by Copeland. The board of directors had grown to seven members, of whom four, including Copeland, were employees of

Venrock or J.P. Morgan, though one of them, defendant C.H. Randolph Lyon, resigned from J.P. Morgan before the loan was made, while remaining a director of Cadant.

The loan was a "bridge loan," which is a short-term loan intended to tide the borrower over while he seeks longer-term financing. The $11 million bridge loan to Cadant was for only 90 days, at an annual interest rate of 10 percent; it also gave the lenders warrants (never exercised) to buy common stock of Cadant. Cadant ran through the entire loan, which had been made in January 2001, within a few months. Venrock and J.P. Morgan then made a second bridge loan, in May, this one for $9 million, again negotiated on Cadant's behalf by Copeland. The loan agreement provided that in the event that Cadant was liquidated the lenders would be entitled to be paid twice the outstanding principal of the loan plus any accrued but unpaid interest on it; as a result, little if anything would be left for the shareholders. The disinterested directors of Cadant (the directors who had no affiliation with Venrock or J.P. Morgan) who voted for the loan were engineers without financial acumen, and because they didn't think to retain their own financial advisor they were at the mercy of the financial advice they received from Copeland and the other conflicted directors.

Cadant defaulted on the second bridge loan, and being in deep financial trouble agreed to sell all its assets to a firm called Arris Group in exchange for stock worth, when the sale closed in January 2002, some $55 million. That amount was just large enough to satisfy the claims of

Cadant's creditors and preferred shareholders (Venrock and J.P. Morgan were both). The sale was approved by Cadant's board, but also, as required by Delaware law and the company's articles of incorporation, by a simple majority both of Cadant's common and preferred shareholders voting together as a single class and of the preferred shareholders voting separately.

The stock in the Arris Group that Cadant received in exchange for Cadant's assets became the property of the bankrupt estate. It was the estate's only asset, and its value fell to a level at which Cadant was worth less than the claims of the bridge lenders and other creditors, with the result that the common shareholders were wiped out. They brought this case initially as a free-standing suit in federal district court. But in an earlier decision in this long-running litigation, *Kennedy v. Venrock Associates*, 348 F.3d 584 (7th Cir. 2003), we held that the suit was a derivative suit—a suit on behalf of the corporation against individuals and firms that had injured it by wrongful conduct. A derivative suit is an asset of the corporation, so if as in this case the corporation is in bankruptcy the suit is an asset of the bankrupt estate. 11 U.S.C. § 541(a)(1); *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1343-44 (7th Cir. 1987); *In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 604 (2d Cir. 1994). Our previous decision therefore directed that the suit be treated as an adversary action in the bankruptcy proceeding. Initially the district court referred the case to the bankruptcy court, but the reference was withdrawn and the case returned to the district court, pursu-

ant to 28 U.S.C. § 157(e), when the plaintiff demanded a jury trial and the parties did not agree to allow the bankruptcy judge to conduct it.

The district judge gave two independent grounds for granting judgment as a matter of law for the defendants. The first was that there was insufficient evidence of proximate cause to allow a reasonable jury to render a verdict for the plaintiff, and the second was that there was likewise insufficient evidence of a breach of fiduciary duty. These grounds turn out to be intertwined. (Ordinarily the issue of duty would precede that of cause, but no matter.)

The term "proximate cause" is pervasive in American tort law, but that doesn't mean it's well understood. A common definition is that there must be proof of "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 989 (2010), quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). But "direct" is no more illuminating than "proximate." Both are metaphors rather than definitions. What the courts are trying to do by intoning these words is to focus attention on whether the particular contribution that the defendant made to the injury for which the plaintiff has sued him resulted from conduct that we want to deter or punish by imposing liability, as in the famous case of *Palsgraf v. Long Island R.R.*, 162 N.E. 99 (N.Y. 1928) (Cardozo, C.J.). The plaintiff was injured when a heavy metal scale collapsed on the railroad platform on which she was standing. The scale had buckled

from damage caused by fireworks dropped by a passenger trying, with the aid of a conductor, to board a moving train at some distance from the scale. She sued the railroad; it would have been unthinkable for her to sue the scale's manufacturer, even though if heavy metal scales did not exist she would not have been injured. No one would think the scale's manufacturer should be liable, because no one would think that tort law should try to encourage manufacturers of scales to take steps to prevent the kind of accident that befell Mrs. Palsgraf. The railroad was a more plausible defendant; its conductor had tugged the passenger aboard while the train was already moving. But how could he have foreseen that his act would have triggered an explosion, as distinct from a possible injury to the boarder? If an accident is so freakish as to be unforeseeable, liability is unlikely to have a deterrent effect.

Coming closer to our case, the defendants cite our decision in *Movitz v. First National Bank of Chicago*, 148 F.3d 760 (7th Cir. 1998). The plaintiff had bought a building in Houston in reliance on what he claimed was the defendant's misrepresentation of its value. Had it not been for the misrepresentation he would not have bought it. Shortly after the purchase the Houston real estate market collapsed and his investment was wiped out. The misrepresentation had not caused that collapse but it had been a cause of the plaintiff's buying the building and thus had contributed to his loss. Yet we ruled, without using the term "proximate cause," that he could not recover from the defendant because (among other reasons) that would produce overdeterrence by

making the defendant an insurer of conditions that he could not control. *Id.* at 763. That would be as futile as making the manufacturer of the scale an insurer of Mrs. Palsgraf's loss.

The present case is superficially similar to *Movitz* because it is possible that what did in Cadant and hence its common shareholders (some at least of the preferred shareholders—such as Venrock and J.P. Morgan—seem to have come out all right) was not the defendants' alleged misconduct but the collapse of the dot-com bubble. And indeed the district court ruled that the plaintiff had failed to prove that the defendants' misconduct had been a "proximate cause" of Cadant's ruination, just as in *Movitz*. But we disagree with his ruling in two respects. First, the burden of proof on the issue of causation (or if one prefers, of "proximate causation") was on the defendants rather than on the plaintiff and the judge cut off the trial before the defendants presented their defenses. Second, there was enough evidence that the bursting of the dot-com bubble did not account for the entire loss to Cadant to make causation an issue requiring factfinding and therefore for the jury to resolve. The dot-com bubble was primarily in the stocks of firms that marketed their goods or services over the Internet. Cadant did not, and anyway it was in the hardware business, the fortunes of which depend on the volume of Internet traffic, which continued to increase even after the bubble burst. There may have been a crossover effect; the collapse of stock values, and the recession (mild though it was) that accompanied it, reduced the amount of venture capital available for

technology companies generally, and so may have made it difficult for Cadant to obtain needed investment on reasonable terms. Our point is only that the effect of the bubble's bursting on Cadant was a jury issue, not an issue that the judge could resolve because the effect was incontestable.

The first point—that the burden of proof on the issue of causation was on the defendants—is counterintuitive. Ordinarily the burden of proving causation is on the plaintiff, since without an injury caused by the defendant there is no tort no matter how wrongful the defendant's behavior was. *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 865-66 (7th Cir. 2010). Delaware law, however, creates an exception for suits against directors of a corporation—an exception not to the requirement that there be proof of causation but to the requirement that the plaintiff prove causation rather than the defendant's having to prove absence of causation.

To explain: When a director is sued for breach of his duty of loyalty or care to the shareholders, his first line of defense is the business-judgment rule, which creates a presumption that a business decision, including a recommendation or vote by a corporate director, was made in good faith and with due care. E.g., *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360-61 (Del. 1993). But the presumption can be overcome by proof that the director breached his fiduciary duty to the corporation—his duty of loyalty and his duty to exercise due care in its performance. "If"—and here we come to the nub of the causation issue in this case—"the [business-

judgment] rule is rebutted, the burden shifts to the defendant directors, the proponents of the challenged transaction, to prove to the trier of fact the 'entire fairness' of the transaction to the shareholder plaintiff." *Id.* at 361; see also references in *Teachers' Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654, 674-76 nn. 30-32 (Del. Ch. 2006).

Delaware law permits the shareholders to adopt (and Cadant's shareholders did adopt) a charter provision exculpating directors from liability in damages for failure to exercise due care, but does not enforce a provision exculpating them from liability for disloyalty, *Emerald Partners v. Berlin*, 787 A.2d 85, 95-97 (Del. 2001), and that is the charge in this case. But does Delaware law govern the issue? Cadant's articles of incorporation in both Maryland and Delaware said that its directors would be exempted from liability for breaches of fiduciary duty to the fullest extent permitted by state law—and the two states' laws are, or at least may be, different. Delaware provides that articles of incorporation "shall not eliminate or limit the liability of a director . . . for any breach of the director's duty of loyalty to the corporation or its stockholders," Del. General Corporation Law § 102(b)(7), while Maryland law allows a corporation to shield its directors from all liability other than for "active and deliberate dishonesty." Md. Code, Courts and Judicial Proceedings § 5-418(a)(2). The plaintiff presented evidence of disloyalty, as we'll see later, but we are uncertain whether it proves "active and deliberate dishonesty." The briefs virtually ignore the issue, and we cannot find a case

decided by a Maryland court that construes the term. An unpublished decision by the Fourth Circuit interprets the term in the Maryland statute as including fraud, *Hayes v. Crown Central Petroleum Corp.*, 78 Fed. App'x 857, 865 (4th Cir. 2003), which is a possible characterization of the defendants' alleged conduct in the present case. And *Mississippi v. Richardson*, 817 F.2d 1203, 1210 (5th Cir. 1987), construes the identical term appearing in a liability insurance policy to cover "wilful neglect of duties," embezzlement, and fraud—and willful neglect of duties seems a pretty good description of the defendants' alleged wrongdoing. And if there was disloyalty in this case it was deliberate, and maybe that's enough to prove "active and deliberate dishonesty."

We needn't decide, because we think the Delaware statute controls, so far as the bridge loans are concerned, and they are the focus of the suit. The negotiations leading up to the first bridge loan took place in the fall of 2000 and the loan was approved by Cadant's board on January 10, 2001—nine days after Cadant's reincorporation in Delaware took effect. Some of the plaintiff's strongest evidence of the disloyalty of the conflicted directors concerns Copeland's actions during the negotiation of the first loan, and the plaintiff argues that that loan initiated the events which led to the desperation sale of the company to Arris.

We cannot apply both states' law to the first bridge loan, and so we fall back (as did the court in the only factually similar case we've found, *Demoulas v. Demoulas Super Markets, Inc.*, 677 N.E.2d 159, 169 (Mass. 1997)) to

general choice of law principles, see *Restatement*, *supra*, §§ 309, 6, and ask which state's law governing the duties of directors the parties would have expected to govern Cadant's internal affairs in the critical period, and which state had the greater regulatory interest in the corporation's internal affairs then. See *id.*, §§ 6(2)(c), (d); *Resolution Trust Corp. v. Everhart*, 37 F.3d 151, 153-54 (4th Cir. 1994). The answer to both questions is Delaware. It was on November 8, 2000, that Cadant's board formally approved the decision to reincorporate, in a resolution which stated that "the Board believes that the State of Delaware has an established body of case law that better enables the Board effectively to meet its fiduciary obligations to the stockholders of the Company." Copeland's failure to disclose disloyal acts that he committed during the negotiation was a disloyal act that caused the loan to be approved, and it was approved in January, after the company had reincorporated under Delaware law. The board would have assumed that, certainly from that day forward, the duties of the directors relating to both that loan and the second bridge loan would be governed by Delaware law.

Apart from the board's refusal to sell the company to ADC Telecommunications, moreover—an act squarely governed by Maryland law and exempted from liability by that law because it was concluded before reincorporation was resolved upon, let alone accomplished—most of the disloyal acts of which the plaintiff complains occurred while Cadant was a Delaware corporation, and most that occurred earlier occurred after the board had decided that Delaware law made a

better fit with Cadant than Maryland law did. So Delaware had a greater regulatory interest than Maryland in the governance of Cadant's internal affairs in the critical period in which the events giving rise to this lawsuit occurred.

We conclude that the articles of incorporation were not effective in waiving Copeland's and the other conflicted directors' duty of loyalty, and so proof of their disloyal acts (had the jury been permitted to find that they'd indeed committed those acts) would have placed on them the burden of proving the "entire fairness" of the bridge loans. But, say our defendants, the plaintiff still had to prove proximate cause and what has "entire fairness" to do with that? In a case like this, everything. For "in the review of a transaction involving a sale of a company, the directors [once the application of the business-judgment rule is rebutted] have the burden of establishing that the price offered was the highest value reasonably available under the circumstances," *Cede & Co. v. Technicolor, Inc.*, *supra*, 634 A.2d at 361—in other words, the burden of proving that the shareholders did as well as they would have done had the defendant directors been loyal and careful. That's another way of saying that the disloyal acts had no effect on the shareholders—no causal relation to their loss.

An alternative mode of rebuttal would be to prove that despite evidence of disloyalty, the directors had been loyal; and then the business-judgment rule would spring back in and insulate the directors from liability. The term "entire fairness" makes a better semantic

match with this form of rebuttal than does showing that the company was sold for the highest price realistically attainable even if the directors who engineered the sale were disloyal. But what would be the need for a concept of "entire fairness" if all that was involved was that if the plaintiff's evidence of disloyalty is compelling enough to place a burden of proving loyalty on the defendant, the latter still can prevail, by proving that he was loyal after all? The alternative version of "entire fairness," which defines a distinct doctrine, is the version applicable to this case. The disloyalty of the defendant directors must be assumed because the judge aborted the trial, and so the defendants have to prove that their misconduct had no causal efficacy because Cadant made as good a deal as it would have done had the defendants been loyal. That's a simple causal question; there's no need to worry about what "proximate cause" means.

The defendants think it heresy to excuse a plaintiff from having to prove causation and to make them prove its absence. But not only is this unambiguously the Delaware rule in a case like this; shifting to the defendant the burden of proof on causation is common in other areas of law, such as employment discrimination. E.g., *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993); *Gacek v. American Airlines, Inc.*, 614 F.3d 298, 301 (7th Cir. 2010). The shift makes sense in cases governed by the business-judgment rule, which creates such a commodious safe harbor for directors that overcoming it requires the plaintiff to make a very strong showing of misconduct. Misconduct however great can be rendered harmless by a supervening event such as the

bursting of a commodity bubble, as in *Movitz*. But as that is exceptional, it makes sense to place the burden of proving supervening cause on the defendant; indeed that is where the burden of proving supervening cause (a cause that wipes out the defendant's responsibility for the plaintiff's injury) usually rests. E.g., *BCS Services, Inc. v. Heartwood 88, LLC*, No. 10-3062, 2011 WL _____, at *__ (7th Cir. March 24, 2011); *Roberts v. Printup*, 595 F.3d 1181, 1189-90 (10th Cir. 2010).

Actually there's enough proof that the alleged misconduct caused loss to Cadant's shareholders to make the issue of causation one for the jury no matter which side has the burden of proof. It was after the dot-com bubble burst, and only a few months before Cadant was sold to the Arris Group for $55 million, that a similar company, River Delta, was sold for $300 million. Cadant couldn't hold out for a comparable deal because of the terms of the bridge loans. If the plaintiff's evidence is credited, Copeland, in cahoots with an employee of J.P. Morgan named Charles Walker (a defendant), used information gleaned from meetings of Cadant's board to reveal to J.P. Morgan and through it to Venrock that Cadant would accept a smaller bridge loan, and for a shorter term, than Venrock and J.P. Morgan would have expected the board to insist on. Walker himself joined Cadant's board soon after the first bridge loan was made, as did another J.P. Morgan employee (Stephan Oppenheimer), who is also a defendant. There is evidence that Copeland, Walker, and Oppenheimer conspired to ensure that Cadant would accept the second bridge loan, which added to the disadvantages to

Cadant of the first loan by creating a generous liquidation preference; as mentioned earlier, in the event of a sale or liquidation of Cadant, Venrock and J.P. Morgan would be entitled to be paid twice the amount of their investment in the company, to the prejudice of the common shareholders.

The smaller the loan, the shorter the term, and the bigger the liquidation preference, the worse for those shareholders. The smaller the loan, the less it strengthens the borrower (Cadant) and thus the harder it is for the borrower to hold out for generous offers from prospective buyers. The shorter the term, the shorter the period for which the borrower can hold out for an attractive sale price. The bigger the liquidation preference, the less the stockholders will realize from the sale in the event—which was looming when the bridge loans were made, and which eventually came to pass—that the firm is forced to liquidate. Uncontaminated by disloyal directors, so far as appears, River Delta, in adverse economic conditions similar to those alleged to have beset Cadant, nevertheless was sold for more than five times what Cadant was sold for a few months later. This is some evidence—and not the only evidence (but we're trying to keep this opinion as short as possible)—that Cadant's common shareholders were hurt by the defendants' misconduct, over and above the hurt inflicted by events over which the defendants had no control. Remember that the trial was bifurcated, so that all the jury had to find was that Cadant had been harmed by the directors' actions; measurement of the harm—specifically, allocating the harm between the misconduct of the defendants

and the bursting of the dot-com bubble—was reserved for the trial on damages, if liability was found.

Even so, the defendants argue, retreating to their second line of defense, there was no breach of loyalty because their conflict of interest was fully disclosed. The conflict *was* fully disclosed. But that misses the point.

Section 144(a)(1) of Delaware's General Corporation Law provides, so far as relates to this case, that if "the material facts as to the director's . . . relationship or interest and as to the contract or transactions are disclosed or are known to the board of directors . . ., and the board . . . in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors," then "no contract" between the corporation (call it *A*) and another corporation (*B*) in which a director of *A* is also a director or an officer, or has some other financial interest, "shall be void or voidable solely for this reason," that is, solely because a director of *A* has an interest in *B*, with which *A* transacted. Copeland was a director of Venrock as well as of Cadant, and Venrock was a lender to Cadant, both as a preferred shareholder (which is a type of lender, not an equity owner) and as a bridge lender. The other defendant directors had a similar conflict of interest. But Copeland (and we may assume the others) fully disclosed to Cadant his (their) relationship with Venrock or J.P. Morgan, the other preferred shareholder-bridge lender, which was acting in partnership with Venrock. This meant that the transactions between it and Venrock and J.P. Morgan, disadvantageous to Cadant though they turned

out to be, could not be voided solely because of the conflicts of interest. And if the conflicts thus were sterilized, the directors could not be found to have committed a breach of fiduciary duty just by virtue of the fact that they negotiated those deals.

But that is not the accusation. The accusation is that the directors were disloyal. They persuaded the district judge that disclosure of a conflict of interest excuses a breach of fiduciary duty. It does not. It just excuses the conflict. (Notice the parallel between the statutory provision and how Delaware law treats the exculpatory clause in Cadant's articles of incorporation.) *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279-80 (Del. 1989); *Off v. Ross*, 2008 WL 5053448, at *11 n. 43 (Del. Ch. Nov. 26, 2008); *Kosseff v. Ciocia*, 2006 WL 2337593, at *6-8 (Del. Ch. Aug. 3, 2006); cf. *Kahn v. Lynch Communications Systems, Inc.*, 638 A.2d 1110, 1117-21 (Del. 1994); *Weinberger v. UOP, Inc.* 457 A.2d 701, 703 (Del. 1983).

To have a conflict and to be motivated by it to breach a duty of loyalty are two different things—the first a factor increasing the likelihood of a wrong, the second the wrong itself. Thus a disloyal act is actionable even when a conflict of interest is not—one difference being that the conflict is disclosed, the disloyal act is not. A director may tell his fellow directors that he has a conflict of interest but that he will not allow it to influence his actions as director; he will not tell them he plans to screw them. If having been informed of the conflict the disinterested directors decide to continue to trust and rely on the interested ones, it is because they

think that despite the conflict of interest those directors will continue to serve the corporation loyally.

*Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114 (Del. 2006), a derivative suit much like this one, provides an illuminating contrast to this case. A director was interested but his interest was known to the board. Having settled that point, the court went on to consider whether he had breached his fiduciary duty to the corporation, and concluded that he had not. He "did not set the terms of the [challenged] deal; he did not deceive the board; and he did not dominate or control the other directors' approval of the Transaction. In short, the record does not support the claim that [he] breached his duty of loyalty." *Id.* at 121. There is enough evidence that Copeland and the other defendant directors did these things to create an issue for a jury to resolve.

Only one further issue need be discussed—the potential liability of Venrock and J.P. Morgan. They of course owed no duty of loyalty or care to Cadant. But to aid and abet a breach of fiduciary duty committed by corporate directors is actionable under Delaware law, *Gatz v. Ponsoldt*, 925 A.2d 1265, 1275-76 (Del. 2007); *Malpiede v. Townson*, 780 A.2d 1075, 1096-98 (Del. 2001); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057-58 (Del. 1984), and the evidence of such aiding and abetting, notably by Charles Walker on behalf of both Venrock and his employer J.P. Morgan, is sufficient to create another jury issue. *Gatz* explains that "to state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege (1) a

fiduciary relationship; (2) a breach of that relationship; (3) that the alleged aider and abettor knowingly participated in the fiduciary's breach of duty; and (4) damages proximately caused by the breach," 925 A.2d at 1275, and *Malpiede* that "a third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party 'knowingly participates' in the breach . . . . Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach. Under this standard, a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting, whereas a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board," 780 A.2d at 1096-97, and *Gilbert* that "although an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders." 490 A.2d at 1058. These formulas, with "lender" replacing "bidder" in *Malpiede* and "offeror" in *Gilbert*, fit this case to a T (always assuming that the plaintiff can prove his allegations). These defendants will of course avoid liability for aiding and abetting if there was no misconduct by Copeland or any of the other defendant directors for Venrock and J.P. Morgan to aid or abet, but we have just ruled that there was sufficient evidence of such misconduct to create a jury issue.

The defendants make some other arguments in support of the judgment, but they are too insubstantial to warrant discussion. The plaintiffs' objections to certain evidentiary rulings by the district court during the trial can abide the retrial.

We note the questionable wisdom of granting a motion for judgment of law seven weeks into a trial that was about to end because the defendants declared that they were not going to put in a defense case. Reserving decision on the motion might have avoided a great waste of time, money, and judicial resources, as the case must now be retried from the beginning.

And because it will be retried Circuit Rule 36 directs that a new judge be assigned unless the parties stipulate otherwise. Either way the parties and the district court may want to rethink how the case should be submitted to the jury. The original trial was bifurcated along traditional lines, separating liability from damages, and with regard to liability for breach of fiduciary duty the proposed jury instructions required the plaintiff to prove duty, breach, causation, and injury. But the burden-shifting structure of the relevant Delaware law—normally applied by Chancery judges—can be difficult for lay jurors to grasp. Although rebutting the application of the business-judgment rule is similar to proving duty and breach, and proving "entire fairness" is similar to disproving causation and injury, the concepts are not identical. When compensatory damages are sought, proving or disproving that the challenged transaction was made at a "fair price" (evidencing "entire

fairness") might require the same evidence as proving or disproving damages. It may therefore make sense to reconsider on remand whether bifurcating liability and damages is the best approach to take in this case. Bifurcation tailored to the requirements of Delaware law might make the jury's job easier. One possibility would be for phase one of a bifurcated trial to focus on the plaintiff's evidence in support of rebutting application of the business-judgment rule and phase two to take up the question of "entire fairness" and, if necessary, damages.

But this is a case-management issue, which was not addressed by the parties and is best left to the judgment of the district judge who will retry the case.

REVERSED AND REMANDED,
WITH DIRECTIONS