In the

# United States Court of Appeals
### For the Seventh Circuit

No. 11-1599

ROSE ACRE FARMS, INC.,

*Plaintiff-Appellant*,

*v.*

COLUMBIA CASUALTY CO. and
    NATIONAL FIRE INSURANCE
    CO. OF HARTFORD,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 4:09-cv-00135-SEB-WGH—**Sarah Evans Barker**, *Judge*.

ARGUED SEPTEMBER 26, 2011—DECIDED NOVEMBER 1, 2011

Before CUDAHY, POSNER, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*.  The plaintiff, Rose Acre, the nation's second-largest producer of eggs, has along with other egg producers been charged in a number of class action suits with conspiring to fix the price of eggs, in violation of section 1 of the Sherman Act. (It has been embroiled in antitrust litigation before, perhaps because it

has been so successful. See *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396 (7th Cir. 1989).) Other violations are charged as well in some of the class action suits, but they are similar to the Sherman Act violations and need not be discussed separately. The class actions were consolidated and transferred for pretrial proceedings to the Eastern District of Pennsylvania, where they are pending. Rose Acre asked its liability insurers to defend it in the class action suits, arguing that the complaints sought damages for what Rose Acre's policies call "personal and advertising injury." As the policies are identical, differing only in the coverage period, to simplify this opinion we'll pretend there's only one insurer, one insurance policy, and, because the antitrust complaints do not differ from each other in any respect relevant to the appeal, one antitrust complaint.

The insurer (for remember we're pretending there's just one) refused to defend Rose Acre, on the ground that the antitrust complaint alleged nothing that could be regarded as "personal and advertising injury." This suit, a diversity suit governed by Indiana law, followed. The district court granted summary judgment in favor of the insurer.

The insurance policy defines "personal and advertising injury" as "injury . . . arising out of one or more of the following offenses," and a list of torts follows that includes "the use of another's advertising idea in your 'advertisement.'" We'll call this coverage "advertising injury."

Rose Acre tries to connect its advertising to the antitrust suit in the following convoluted manner. The company belongs to United Egg Producers, Inc., the trade association of egg producers. The association publishes animal husbandry guidelines, see United Egg Producers, *Animal Husbandry Guidelines for U.S. Egg Laying Flocks* (2010 ed.), www.uepcertified.com/media/pdf/UEP-Animal-Welfare-Guidelines.pdf (visited Oct. 5, 2011), and permits producers who comply with its guidelines to market their eggs as "United Egg Producers Certified." Rose Acre does that, and it also advertises its compliance with the guidelines on its website, www.roseacre.com/ (visited Sept. 26, 2011), where it points out that it sells not only eggs produced by caged chickens, but also eggs produced by "free-roaming" chickens—chickens that are not caged (they have nests in their hen houses but are free to run around) and subsist on a vegetarian diet. (See the excerpt from the website at the end of this opinion.)

The website states (along with much else—including an answer to the question which came first, the chicken or the egg[*]) that "eggs from the 'Free-Roaming' farms cost much more than regular eggs because the eggs must

---

[*] "Answers to 11 Frequently Asked Questions about Chickens," www.roseacre.com/eggfaq.html (visited Sept. 26, 2011): "11. Which came first, the chicken or the egg? Answer: According to the Bible, the chicken came first. 'And the evening and the morning were the fourth day. And God said, "Let the waters bring forth abundantly the moving creature that hath life, and fowl that may fly above the earth in the open firmament of heaven." ' Genesis 1:19-20."

be gathered by hand from the individual hen's nest. All of our chickens are kept in a humane and friendly environment. Plenty of fresh water, fresh air, and fresh feed are available to each chicken at all times, with plenty of space for each chicken to move about and socialize with the other chickens." www.roseacre.com/eggfaq.html (visited Oct. 27, 2011). This statement could be thought intended to throw consumers suspicious of the high price of eggs laid by free-roaming chickens off the scent, and make them think the high price the result not of a conspiracy among egg producers but instead of the chickens' healthful and humane living conditions; those conditions increase labor costs (the eggs must be gathered by hand) and probably other costs as well, since the chickens have more space.

But that interpretation is not alleged in any of the 353 paragraphs of the antitrust complaint. The complaint doesn't mention Rose Acre's website, or any other advertising on defendants' websites; it doesn't quote the passage we quoted from the website about eggs from "free-roaming" chickens being more costly. It says that "Rose Acre has participated in and profited from UEP's and its [presumably the "its" is "Rose Acre's"] efforts to reduce supply and fix prices," that "Rose Acre has agreed to the conspiracy by selling UEP certified eggs," that "UEP Certified companies [such as Rose Acre] are permitted to display the UEP Certified logo on their packaging and to market their eggs as 'United Egg Producers Certified,'" and finally that "all UEP Certified eggs must also be marketed with the phrase 'Produced in Compliance with the United Egg Producers' Animal

Husbandry Guidelines.' " But the antitrust complaint complains only about conspiring to fix the price of eggs from caged chickens, and nowhere does Rose Acre's website state that the cost of *those* eggs is increased by the measures taken to make the chickens that lay them healthy and happy—though remember that it does say that *all* its chickens have a healthy and friendly environment, so perhaps there's a faint implication that all Rose Acre's eggs are more expensive than they would be if the company did not give more weight to its chickens' mobility and social opportunities than to the cost of their eggs.

But this suit would fail even if one could tease out of the antitrust complaint a charge that Rose Acre's advertising was in furtherance of the alleged antitrust conspiracy. Coverage of liability for an "offense" defined as "the use of another's advertising idea" in one's own advertising cannot extend to using another's advertising idea with that other's consent. Suppose Rose Acre published on its website the following ad, written by its director of marketing: "We are socialists, we abhor profits, and we sell all our eggs at cost." Although the ad might be thought in furtherance of the antitrust conspiracy, any antitrust liability that it created would not be "advertising injury" because the company's marketing director is not "another." What difference could it make if instead the ad had been written by Rose Acre's advertising agency?

Antitrust liability, moreover, is a major business risk, especially for one of the largest companies in a major

market. It is hardly likely that parties to an insurance contract would seek to cover such a serious risk indirectly through an "advertising injury" provision aimed at misappropriation and other intellectual-property torts.

It is a standard provision, as so many provisions in insurance policies are; it was drafted by ISO (Insurance Services Office, Inc.), a coalition of insurance companies that among other things drafts standardized insurance policies for its members and other insurance companies, see "Company Background," www.iso.com/About-ISO/ISO-Services-for-Property-Casualty-Insurance/Company-Background.html (visited Oct. 27, 2011), including liability insurance policies. See *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993). The provision, which has been approved by Indiana's insurance commissioner, replaces an earlier provision that defined advertising injury as "misappropriation of advertising ideas or style of doing business." 4 David A. Gauntlett, *New Appleman on Insurance Law* §§ 30.01(4)(a)(ii)(B)(3)-(C) (2011); *State Farm Fire & Casualty Co. v. Steinberg*, 393 F.3d 1226, 1231 n. 2 (11th Cir. 2004). Rose Acre points out that "use" does not carry the pejorative connotation of "misappropriation." True; but the reason for the change of wording had nothing to do with Rose Acre's argument. The reason was that a conflict had developed in the courts over whether "misappropriation" was used in the policy in its common law sense, which does not include trademark infringement, or should be read in a broader, layperson's sense. Compare *State Auto Property & Casualty Ins. Co. v. Travelers Indemnity Co.*, 343 F.3d 249, 255-57 (4th Cir. 2003) (North Carolina law), with *Advance Watch*

*Co., Ltd. v. Kemper National Ins. Co.*, 99 F.3d 795, 802-03 (6th Cir. 1996) (Michigan law); see also *United States Golf Ass'n v. St. Andrews Systems, Data-Max, Inc.*, 749 F.2d 1028, 1034-35 (3d Cir. 1984); 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 10:72, pp. 10-190 to 10-193. To resolve the conflict, ISO replaced "misappropriation" with "use" and, for good measure, added explicit coverage for trademark infringement. Gauntlett, *supra*, § (4)(a)(ii)(C).

This history makes clear that coverage is limited to liability to the "other" whose advertising idea is used by the insured without the "other's" permission. That is what "misappropriation" is; and the question whether as used in an insurance policy it might embrace trademark infringement does not alter the understanding that using someone else's idea with that someone's consent is not misappropriation.

Furthermore, the policy does not apply to advertising injury that is "caused by or at the direction of the insured with the knowledge that the act [triggering liability] would violate the rights of another and would inflict 'personal and advertising injury'" or that "aris[es] out of a criminal act committed by or at the direction of any insured." Participation in a conspiracy to violate federal antitrust law is both deliberate and criminal, and is thus excluded from coverage by both provisions. See *Del Monte Fresh Produce, N.A., Inc. v. Transportation Ins. Co.*, 500 F.3d 640, 642-44 (7th Cir. 2007); *Curtis-Universal, Inc. v. Sheboygan Emergency Medical Services, Inc.*, 43 F.3d 1119, 1123 (7th Cir. 1994); *Trailer Marine Transport*

*Corp. v. Chicago Ins. Co.,* 791 F. Supp. 809, 812 (N.D. Cal. 1992).

It is true as noted in the *Curtis-Universal* opinion that if an insured asks its liability insurer to defend a suit that alleges conduct that is potentially covered by the policy as well as conduct that is not, the insurer must defend the entire suit. 43 F.3d at 1122; see also *Transamerica Ins. Services v. Kopko,* 570 N.E.2d 1283, 1285 (Ind. 1991); *Liberty Mutual Ins. Co. v. OSI Industries, Inc.,* 831 N.E.2d 192, 200 (Ind. App. 2005); *Aearo Corp. v. American Int'l Specialty Lines Ins. Co.,* 676 F. Supp. 2d 738, 745 (S.D. Ind. 2009) (Indiana law). But the antitrust suit for which Rose Acre wants a defense makes no claim that the policy could be thought to cover.

We note finally that the Eleventh Circuit, in a case decided a week before the oral argument in this case, rejected an identical claim by a firm represented by Rose Acre's counsel in this case. *Trailer Bridge, Inc. v. Illinois National Ins. Co.,* 2011 WL 4346579 (11th Cir. Sept. 19, 2011) (per curiam).

The judgment of the district court is

AFFIRMED.

## Rose Acre Farms—Cage Free

